374

[Civ. No. 4981.   Fourth Dist.   Mar. 30, 1956.]

B. H. JENNINGS et al., Respondents, v. L. M.
AZHDERIAN et al., Appellants.

Linneman, Burgess, Telles & Van Atta and C. E. Van Atta
for Appellants.

Dubsick & Whalen for Respondents.

BARNARD, P. J.—This is an action for the reasonable
value of work, labor and materials furnished by the plaintiffs
in drilling a well for the defendants.

The defendants owned a section of virgin land in western
Fresno County, which had never been cultivated.  In January
1952, the parties entered into an oral agreement under which
the plaintiffs were to drill three water wells on defendants'
property and the defendants were to pay $4.00 a foot.  This
price included the installation of the casing and the placing
of certain gravel, which items were to be furnished by the
defendants.  The plaintiffs drilled, graveled and cased Well
No. 1 for which the defendants paid on its completion, at a
depth of 1,800 feet.  The plaintiffs then started to drill Well
No. 2 at a point about three-fourths of a mile from Well No. 1.
This well was drilled to a depth of about 1,400 feet when work
was abandoned, and the well was never completed.  The

defendants refused to pay for the work done and the plaintiffs brought this action. At the trial the defendants took the position that there was an express contract between the parties for the drilling, casing and graveling of the well in issue, and that plaintiffs had failed to substantially perform the contract since they had not cased or graveled the well. It was also contended that the plaintiffs had abandoned the work because the well was so crooked that it was impossible to insert casing therein, and that the defendants had not consented to such abandonment. The court found in favor of the plaintiffs, finding that the reasonable value of the work done was $3,322. Judgment was entered for that amount, and the defendants have appealed.

The appellants contend that the evidence established an express contract for the drilling, casing and graveling of Well No. 2; that there was no substantial performance by respondents since the well was not cased and graveled; that this express contract cannot be converted into an implied contract, so as to permit recovery without full performance, by the mere fact that the hole was claimed to be dry; that there was no evidence justifying the abandonment of the well on the ground that it would not produce sufficient water, since the evidence shows that no real test of the well could be made because it was never straight enough to case or to insert a pump for the purpose of testing it; and that the appellants never consented to the abandonment of the work.

While there was an express contract for the drilling of a well at a fixed price per foot there was no agreement as to how deep drilling should go, and no agreement concerning the successful production of water or what should be done in case it should appear undesirable to further continue the drilling operations. During the trial appellants' counsel told the court "We do not contend that the plaintiffs were bound to produce a well that gave us water," and that their contention was that the plaintiffs could not abandon the work without the consent of the defendants. Since there was no express contract with respect to these matters they presented questions of fact for the trial court. The controlling questions here are as to whether the evidence supports the findings and conclusions to the effect that the circumstances were such as to justify the respondents in their failure to continue with the work, and that the work ceased with the consent or acquiescence of the appellants.

It appears that the appellants were attempting to develop water on a higher portion of their ranch, and that they were unsuccessful although water was developed on the lower portion of the ranch. One of the appellants testified that they had planted crops that year "on the basis of the optimism of what we were told about the probability of water in that area" and what they had seen in two wells on neighboring land. Well No. 1, after pumping 10 days, pumped so much sand as to be useless and was abandoned. After the respondents stopped work on Well No. 2 the plaintiffs hired another driller and Wells No. 3 and No. 4 were drilled in the same area. Well No. 3 produced some water for the rest of that season and part of the next, and was then abandoned. Well No. 4 was a dry hole. One of the appellants testified that after April, 1952, they did not attempt to dig other wells in the area where Wells No. 1, 2, 3 and 4 were drilled, that they then went "down below" on their ranch where they found water conditions better, and that "We found out several weeks afterwards that it was better down below."

There was testimony for the respondents that the decision to cease drilling Well No. 2 was based on the unsatisfactory performance of Well No. 1, similarity of drilling samples found in the two wells, and the opinion that no water would be obtained. When conditions appeared unsatisfactory the respondents employed an expert, engaged in that business, to make several tests on Well No. 2. The first was an electric log test, which was to determine the presence of water-bearing strata. There was a little more water-bearing strata in Well No. 2 than in Well No. 1, but the expert testified that the presence of water-bearing strata did not necessarily mean that there was water in it, and that they had frequently found that wells with good water-bearing strata turned out to be dry holes. Two directional tests were also run by the expert which showed that the hole was not straight, but there is a conflict in the evidence as to whether or not it was straight enough to permit the installation of a pump, or as to whether or not it could be successfully straightened. After these tests were made two conversations were held by the parties relative to the well drilling problems. The respondents took the position that the hole could be straightened, but that it was not wise to spend any more money on the well due to the lack of water at that location. There was evidence that the appellants complained about the crooked hole but did not request the respondents to straighten it, or to complete the well. Two

days after the second conversation the appellants hired another drilling concern which came in and drilled Wells No. 3 and 4 without much success. After the first of these conversations the appellants started to straighten the hole by widening it, but stopped work after the second conversation which led to the hiring of another driller by the appellants.

The evidence is conflicting as to what was said at these two conversations. The appellants testified that the main talk was about straightening the hole, and that their water engineer advised them that the prospect for water was good. The respondents testified that the main talk was concerning the bad prospects for getting a successful well; that they could straighten the hole but considered this to be useless in view of the water conditions; and that they did not desire to cause further useless expense to the appellants. One of the respondents testified that he told the appellants that if they thought their engineer was right, and if they would pay for the pipe, he would put the casing in; that he could have put the casing in the hole as it then was; and that one of the appellants replied that they did not want the casing put in. This witness was also asked "Now, what did Mr. Azhderian, either one of them, say to you about that well so far as either continuing or not continuing to develop it for water?" He replied, "They did not want to go ahead with that well. They were through with it." One of the appellants was somewhat evasive in his testimony with respect to what was said at these conversations. When asked whether anything had been said at the second of the conversations above mentioned about giving up this well he replied: "There may have been," but that it was really more of a question of whether the respondents could straighten the hole, and that "We certainly weren't willing to take it if he couldn't straighten it out."

While the evidence is conflicting and not too satisfactory in many respects it is sufficient, as a whole, to support the court's findings and judgment. When another well was started it was started some distance from Well No. 2, and the evidence indicates that the appellants as well as the respondents were not satisfied with the water conditions as they appeared at the time work ceased on Well No. 2. From respondents' testimony and from a part of the testimony on behalf of the appellants, the court was justified in concluding that the appellants agreed with respondents' conclusion at that time that it would not pay to put more money into Well No. 2 because of the water conditions as they appeared at the time,

and that they acquiesced in, if they did not expressly consent to, the cessation of work on Well No. 2. There was no express contract covering this situation, it was admitted that the appellants were not bound to produce a good well, and there is nothing in the evidence to justify the conclusion that the respondents were bound to continue drilling indefinitely, or to put in casing whenever they stopped, regardless of other conditions, before they were entitled to be paid for their work. Well No. 4 was admittedly put in as a test well at an agreed price of $2.50 a foot, and the court allowed less than that price as the reasonable value of the work done on Well No. 2. In the absence of any specific contract covering the circumstances here involved the respondents were entitled to recover on that basis for the work done.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.